The next case up is 4-12-0591 and 4-12-0592, People of the State of Illinois v. Robert Ford. Attorney Schiffman is here on behalf of the appellant. Attorney Brooks is here on behalf of the appellee. I want to thank both of you for coming to court early, and we were able to get started early today, so thank you. Mr. Schiffman? Thank you, Justice Pope. May it please the Court. I appear this afternoon on behalf of Robert Thomas Ford, who was known throughout this case as Tom Ford. And just as a housekeeping matter, while the case is here on two separate numbers, it is one case. The original indictment returned against Mr. Ford after some pretrial hearings was dismissed. A new indictment was returned, and when the new indictment was returned, the state attorney decided to return it under a new number, a separate number, resulting in two filings in the clerk's office, resulting in two separate cases that have gone up now to this court on appeal. To the extent that we have been able to, we have tried to designate in the record where certain things occurred during the trial. There are three issues that I would like to discuss this afternoon. The constitutionality of the statute as applied to Mr. Ford, the denial of Mr. Ford's request for a bill of particulars, and the jury instructions. There are other issues raised in the appeal, but I would like to focus my time on those three issues. And I would also like to suggest to the Court and state to the Court that those three issues are very much intertwined. Because the bottom line of this case, insofar as it respects Mr. Ford, is this. Mr. Ford was tried and convicted in Sangamon County of the crime of financial exploitation of the elderly. In this case, the elderly person was his mother. And in this case, he and his mother had a binding legal relationship that the law recognizes and the law has recognized for centuries. Mrs. Ford, Patricia Ford, Tom Ford's mother, as she advanced in years, gave Mr. Ford a power of attorney over her financial matters. It is uncontradicted from the evidence in this case that Mr. Ford had that power and that his mother gave him that power freely, voluntarily, and after consultation with an attorney, an attorney who testified by stipulation at the trial, that at the time that the power of attorney was created, the mother, Patricia Ford, seemed to be clearly capable of understanding what she was doing and wanted her son to control her financial affairs. Our first problem with this case comes about in the manner that the statute was applied to Mr. Ford. The authority of the Illinois Supreme Court from its recent case of People v. Madrigal makes it very clear that when a statute criminalizes innocent conduct, that statute does not meet the constitutional requirements of due process, either under the federal constitution or the Illinois constitution. And that is precisely what happened in this case to Mr. Ford. The indictment in this case merely said that over a period of years, he illegally used money of his mother. Again, money that he had the legal right to use and to deal with under the power of attorney. The evidence in this case, when this case came to trial, essentially was this. A witness from the State Department of Law Enforcement testified that she examined Mrs. Ford's checking accounts, a checking account that was actually a joint checking account, and Tom Ford's individual accounts. She testified that when money came into the joint account of Patricia Ford and Thomas Ford, that Thomas Ford would transfer it into his own personal account, and from that account he would pay all of the bills of his mother, as well as his own bills. Mr. Ford testified that the reason he did that was because it was for convenience, and because during the course of this period of time that the state alleged this financial exploitation had occurred, that he had been traveling. He had obtained employment. He testified freely, and he testified very candidly, that he had a period of time during his life when he was undergoing financial distress and difficulty. And he was concerned for his mother, but he had to take a job that required him to leave the state of Illinois. He traveled and worked for the Ringling Brothers Circus. And it was for his ease that he placed the money in his own account. The problem with the manner in which the state proceeded was this. There was never any designation by the state in this prosecution as to what transactions constituted illegal action by Mr. Ford, what transactions constituted financial exploitation. It was just this essentially dropping in the jury's lap three or four years of financial transactions and saying it's over $100,000. You need to defend its guilty. To deal with that problem, Mr. Ford, first of all, sought a bill of particulars. And in requesting his bill of particulars, he asked for which transactions were specifically indicated by the state to be illegal. The state declined to answer his request. The trial court denied his request for a bill of particulars. Now, I recognize fairly well after years of criminal practice that it is very rare that a court will grant a bill of particulars. And I think to some extent the reason is because the discovery rules that we now have in criminal cases are much more liberal than they were years ago. We do not try people by surprise or ambush anymore. The state furnished a lot of financial information. But the problem with the financial information in this case is that it makes no distinction whatsoever between those acts that were perfectly within Mr. Ford's justification and those within his rights under the law, excuse me, and those that were not. There was never any indication here that this transaction that Mr. Ford engaged in was improper under the law. Now, the state suggested in their brief, I believe at one point, well, actually it's page five of their brief, they say that the defendant knowingly obtained and illegally used his mother's assets by breaching their fiduciary relationship at times when he sold her condominium and withdrew her retirement income into his own account without paying much of her nursing home expenses. Well, of course, the problem with that is that it comes about not in a legal document. It comes from a letter that the state's attorney's office directed to Mr. Ford during the pretrial proceedings in this case. The indictment in this case, the indictment makes no such distinction. The indictment merely says the defendant standing in a position of trust and confidence with Patricia Ford, age 83, knowingly obtained and illegally used the assets of Patricia Ford being United States currency. Now, even when courts are reluctant to grant bills of particulars because they may be reluctant to require the state to hew to certain statements that they make in their bills of particulars, this clearly was a case where such an action should have been taken by the trial court. And indeed, while the state would like to distinguish, the one case that we were able to find where the court's refusal to grant a bill of particulars was considered error, the federal case, I believe it's Barnofsky, cited in our brief, that case is clearly on point. Again, Mr. Ford is not required to prove his innocence. Mr. Ford is not required to justify every legal expenditure that he made under a legal authority that he had through the power of attorney. Don't you think Mr. Ford, though, counsel, was put on notice that he was going to have to explain what happened to that condominium money once the condominium was sold, and further have to explain, be called upon to explain why the retirement income from his mother was put into his private account? Justice Turner, he was and he did. He explained the money was moved into his account because it was done for his convenience while he was traveling. That was number one. Number two, with respect to the condominium, he made a very, very specific statement. The condominium proceeds were roughly $20,000. And, in fact, I believe he testified that the sale from the proceeds of the condominium gained much less money than they thought. The proceeds were $20,000. $5,000 of that money went to St. Joseph's Home to pay for the bills that his mother was incurring. And, in fact, also keep in mind that there were insurance proceeds, though. The balance of his money, and this, Justice Turner, is where this case creates substantial difficulty. The balance of that money was invested by Mr. Ford with the hopes that the investment would return some additional money for his mother. Unfortunately, it was invested at a period of time when the financial behavior of the United States of America was not very good. And his investment lost money. I probably didn't phrase my question very well because you kind of went into the sufficiency of the evidence argument there. But my point was he knew he was going to have to explain the retirement proceeds from his mother going to his private account, and he knew about the condominium sale and what happened to that money. He was going to have to explain that, I mean. So getting back to your bill of particulars, why did he need one? I mean, it's clear that those are going to be issues that the jurors are going to have to take into consideration. He needed a bill of particulars because the manner in which the state brought this prosecution that all of this money was improperly used by him left him in the situation, Justice Turner, where he had to essentially establish his innocence. He had to go back and take each and every financial transaction and say, this transaction went to buy my mother's prescription drugs. This transaction went to pay for my mother's meals. This transaction did other things for my mother. That is not the way the criminal law should operate. And that is not the way I think the Illinois Supreme Court feels it should operate in this type of a statute. Now, Justice Turner, they could have charged him with straight theft. They could have charged him with some other crime. But remember, they chose the financial exploitation statute. They chose this very broad statute. They chose a statute which can be interpreted and was indeed applied in this case to lump innocent conduct with criminal conduct, with potentially criminal conduct, and in that way allow for his conviction to aggregate to money over $100,000. And I would just point out, although it's not an issue that we argued, well, I shouldn't say it that way. It perhaps relates to the sufficiency of the evidence when I do point out to the court that there was, in fact, great difficulty that the trial court had at the time of sentencing in determining what exactly was the amount of money that was due and owing to Mrs. Ford as restitution. And in fact, that leads to a totally different problem, Justice Turner, that I think is related to your question. But let me just stay on this point for just one second and indicate to the court the trial judge, as she determined the amount of restitution, noted that there were at least two years during this period of time that the indictment covered, there were at least two years during that period of time when Mr. Ford paid more money for Mrs. Ford's expenses than she actually received. Now, the state again says, well, what happens in a restitution hearing is not evidence at trial. And I grant that it wasn't evidence at trial, but I think it is indicative of the problem here and the constitutional, the due process dilemma that Mr. Ford faced. And it was made even perhaps worse by what happened at the time when the instructions occurred in this case. Dr. Schiffman, before you move into that, can I ask you, at the time he had the proceeds from the condominium and he applied $5,000 to St. Joseph's, how much was owed to St. Joseph's at that time? I'm not certain, Justice Pope, and I will tell you why, because there was always, there were some questions with respect to the amount of money that was owed to St. Joseph's Home. And I will just point out two things to you with respect to that. At no time, at no time did St. Joseph's Home, I believe there is testimony in the record to this effect, at no time did St. Joseph's Home ever sue Mr. Ford or Mrs. Ford for any unpaid expenses, number one. At no time did they ever submit a bill to him. There were difficulties when she first came into the home because she was receiving insurance proceeds. I know that there is, the record indicates at one point that there was a, I believe $46,000 that was owed to St. Joseph's Home that was written off by St. Joseph's Home, by their accountant. And I'm not denying that perhaps he owed her money, that she or he owed money to St. Joseph's Home. But interestingly, this case was not a collection by St. Joseph's Home against Mr. Ford. Had that been brought, we would not even be here. Remember, that's a civil dispute. And that's a dispute that, again, didn't even come up until the trial. I guess what I'm asking you is did the jury have information that there was this large amount of money owed to St. Joseph's? Yes, they did. He had proceeds from the sale of the condominium, and instead of applying them to her bills, he only applied a small portion of them and then invested the rest of the money in something else that lost money. There was testimony in the record to that effect. But that testimony, remember, again, St. Joseph's Home is not even named in this indictment. The first time that St. Joseph's Home becomes involved in this case is in the opening statement of the prosecution after the jury has been selected. St. Joseph's Home never sued either Ford for this money. And even at this point in time has never sued Mrs. Ford or Mr. Ford for the money that is allegedly owed to them. And I don't have a problem with St. Joseph's. I don't have a problem with any civil action brought in this case. I don't have a problem if the guardian, the new guardian in this case, wishes to allege that perhaps Mr. Ford may have violated his fiduciary duty in a civil sense. But when you criminalize conduct like this, Justice Pope, I think you raise some serious problems for anyone who is in this type of a relationship, this type of a financial relationship with a parent or any other relative. With respect to the instructions, the difficulty here, again, I think, with the instructions, is in part created by the fact that the only case law, I see my time is up. I just would like to say this. You've got until the red light. Oh, the red light, okay. I just never remember. The only case on this point that I have cited in the brief requires the intent to permanently deprive. Apparently, with respect to this crime, the legislature, in response to that case, removed that from the statute. And that creates the difficulty here. Now we have a statute that eliminates a theft statute that no longer requires intent to permanently deprive, and as a result, sweeps innocent conduct into the ambit of the statute. The judge, when faced with that dilemma, just, we believe, abused her discretion by not creating instructions here that wholly and completely instructed the jury on the elements of this case. And in response to the state's suggestion that, well, there were some civil instructions that the judge used, that's the problem here. When the state seeks to criminalize a civil dispute, they punish innocent conduct. And in this case, we believe that Mr. Ford's conviction should be reversed, and he certainly is entitled to a new trial where the jury can be properly instructed and where the evidence that the state presents can at least be limited in part by a bill of particulars where specific illegal acts by the state must be presented to it. Thank you, Mr. Shiffman. Ms. Brooks? May it please the court and counsel, my name is Anastasia Brooks, and I represent the people in this case. First of all, I'd like to talk about the constitutional issue. The defendant's argument seems to be that, as he emphasizes, that the state cannot criminalize something that would ordinarily be a civil matter, absent a statute that purports to criminalize it. Well, if misappropriation by breach of a fiduciary duty is something that can be remedied in civil court, then it's not innocent. The only question is, what should the penalty be? Should it be simply a civil remedy, or can it be criminalized? Well, somebody can get damages for battery, but without a battery statute, it doesn't become a crime. So essentially, Mattergold, the case relied on by the defendant, does not report to hold that a state cannot criminalize something that would ordinarily be something like a tort. But that statute was an identity theft statute that was so overly broad that it swept in conduct not related to the harm that the legislature was trying to protect against. Such as someone that performed a Google search, something innocuous, to try to find out how their neighbor did in the Chicago Marathon, violated the statute that was held invalid in Mattergold. Because that did not pertain to the harm of identity theft that the legislature was trying to remedy. Well here, what the legislature is trying to do, at least one purpose, is to prevent misappropriation of assets through breach of fiduciary relationships.  And then it is no longer a wholly innocent conduct that the legislature cannot make criminal. So the fact that the defendant says this is essentially like a strict liability defense. Well, he also says there has to be something more than mere knowledge. Well, strict liability claims have no culpable mental state. Knowledge is a culpable mental state. Criminal intent is not required for every criminal statute. So just because mere knowledge, a knowing misappropriation of assets, the illegal use of assets, if knowing, is no longer invalid because it is claimed to be a strict liability offense. So intent is not required. And when the legislature took out an intent from this offense in Public Act 93-301, the legislature did not make an unconstitutional statute. And the fact that the IPI instruction was not updated in light of the legislative amendment made it appropriate for the child court to issue a non-IPI instruction omitting the intent to permanently deprive as an element of the crime. Because it was no longer an element of the crime under the law in effect at the time of defendant's offenses. So the instruction about the presumption of a gift, that was inapplicable in this case because when a gift is made by a donor to someone who stands in a fiduciary relationship to that person, then there's the presumption of a fraud. So the presumption of donative intent, which applies when money is transferred into a joint bank account, is canceled out because you have a case in which there are conflicting presumptions. And therefore neither presumption applies. And because neither presumption applied, there was no duty by the child court to instruct the jury about the presumption of donative intent like the defendant requested. With respect to the Bill of Particulars, Barnofsky is distinguishable  And in that case also, there was only a few days for trial. And also in that case, not all the transactions that were involved were alleged to have been criminal. What are we to make of this letter that the state submitted? What's that kind of a sort of way to comply with the motion for Bill of Particulars? Well, the trial court treated it as effectively a response to the Bill of Particulars. That's in the record I missed. So the trial court said, I consider this letter a response to the motion for Bill of Particulars. Counsel, there was a spreadsheet along with the letter. Is that correct? Yes, Your Honor. That's what I was getting to. Essentially, if I can find it for me to read. I'm not sure exactly about the part of the record that, Justice Turner, you're referring to. My understanding was that the reason why the trial court did not require a further reply to the Bill of Particulars is because this had already been disclosed. There was perhaps some timing difference between the initial indictment, the Bill of Particulars, the dismissal of that indictment, and if the defense requested additional information in this case. Essentially, the defense knew that the allegation was here, that all of these transactions identified in that spreadsheet were illegal. And the defense's position below was, well, that couldn't possibly be the case. All of these cannot be criminal. Well, that's not an argument that they are prejudiced in preparing their defense. That's an argument that they dispute whether what the defendant did is a crime, which is the purpose of having a trial. It's not the purpose of the Bill of Particulars to determine whether a particular transaction was indeed criminal. The defendant understood what the state was going to attempt to prove at trial, which was that all of these were criminal. Unlike the case of Bernarski, where in that case, not everything was going to be held to be criminal. So the prosecution essentially hit the ball, trying to frustrate the defense in preparing their defense by giving them too much, essentially, and under that mountain of information, hide what they were going to try to prove at trial. Here, what was described in this letter in the spreadsheet was exactly what the state tried to do at trial, which is to prove that every single transaction in which money was removed by the defendant from the joint banking account, monies that represented the monthly direct deposits of his mother's Social Security and pension, as well as the sale of the condominium, that all of those transactions constituted a breach of fiduciary duty and illegal use of assets. Now, the defendant points to trying to justify what he describes as every particular expenditure that he made. Well, these are expenditures that he's making out of his own personal account. Under the state's theory, the misappropriation has already occurred. The moment he's taking that money out into his own account, that's the allegation of misappropriation. What he does with that money afterwards is not legally relevant, except to the extent that it might show that he didn't act knowingly in terms of illegal use of assets. So, for example, when he sold the condominium, he signed the check as a POA, power of attorney. He put the money in his own bank account. He could have put it in the joint checking account that his mother held and then paid it over to the home. Instead, he put it in his own account. Then he wrote a check out of that account of, I believe it might have been close to $10,000, and put it into something like a fidelity investment account. And that was also in his own name. $5,000 within days after cashing the check went to stay Joseph's home. So some of that money eventually made it to pay down his mother's debts, but it was already commingled with his own funds. Whether it's three days or a year or three years, it's not necessarily legally relevant how long that money had been unlawfully commingled when he could have simply just deposited that check in the joint account that his mother already held. So there was at least $5,000 of illegal use of assets because his mother turned age 80 the day after she entered St. Joseph's home. One of the counts of the indictment required only $5,000 as the relevant amount, not $100,000. So therefore, even if the evidence was not sufficient to show that at least $100,000 over age 16 had been misappropriated, the evidence was clearly sufficient to show at least $5,000 had been illegally used because she was at least age 80 at the time she was in St. Joseph's home. This was sort of like a case like Ingrate Estate of Savage, which is a civil case, but it shows the relevant principles. This was a convenience account. There's no way that she was going to disregard her own financial security when all the evidence showed that what she really cared about was being able to stay in St. Joseph's home. So why would she then let her son, acting on his own, withdraw all of her retirement funds and pay down his own debts with it and let her run up tens of thousands of dollars in debts that might jeopardize her future ability to stay at St. Joseph's home? So in that circumstance, there's no donated intent. It's a situation where it is exploitation. It's a situation where the defendant breached his fiduciary duty as power of attorney, withdrawing the money to his mother's detriment for his own benefit. That is a crime, according to the legislature. And the legislature can constitutionally make that a criminal offense because the legislature at least made it a crime for someone who is either elderly or disabled who is the victim of this. So it's not necessarily the case that he moved this money just because he was traveling. This arrangement, I'm not sure exactly the dates, but there was some timing issue in terms of when this arrangement of withdrawing the money every month happened versus when he got the circus job and began to travel out of state. And what I believe his initial explanation was that his son was stealing or having some access to his mother's checkbook, and that's why they initiated this sort of routine of withdrawing the money out of his mother's account was to protect it from misuse by someone else other than the defendant, the defendant's son. The trial court doesn't have to believe, or the trier fact does not have to believe that explanation. And the trier fact did not have to believe this explanation that St. Joseph's Home, according to the defendant's understanding, was purely satisfied with simply receiving the CNA insurance proceeds in a situation where St. Joseph's Home was not in fact satisfied with receiving just insurance money. And was not even necessarily told that she had these other resources available to pay her expenses at the time they were accumulating. And with respect to this argument that somehow the restitution order shows that the defendant did not in fact exploit his mother, the argument is made that he had paid more for her expenses than she had received. Well, that does not include the amounts of receipt that she had, which CNA was paying at $92.50 a day. In the state's brief on page 27, the state argues that the defendant would have collected at least $69,000 in these periodic payments before the home insisted that the insurance money go directly to the home. Why? Because the insurance company was paying the defendant. The defendant was not necessarily paying everything and timely over to the home. So the insurance money was not necessarily going to the home. And what was credited according to the restitution order was $59,000. Well, that means that the home was not even getting all of the insurance money, and that's not even counting the Social Security and the retirement pension. So essentially what the story of this case is, is that all that retirement money effectively, plus some of the insurance money, was going from his mother to his own pocket to pay off his own debts. And there was more than enough evidence to show exactly that that's what happened, and the law is that that should be criminal, and the defendant was properly punished for it. And so the fact is that also the defendant argues he had legal authority because he was a power of attorney. Well, the law is also that you cannot breach a fiduciary duty. Just because you have power of attorney doesn't give you carte blanche to do anything you want as a fiduciary with the funds in the estate of the person who gave you that power. You still have that duty to not abuse the fiduciary powers that you have. So the fact that he might have, quote, legally possessed it because his name was on the joint bank account and he was able to sell the condominium as power of attorney, doesn't mean that he cannot be held criminally to account for what he did with that money. So it was not, that money did not go to something that was necessarily in his mother's best interest. Ms. Brooks, is to misappropriate the same as to illegally use? Misappropriation is included within the definition of illegally use, I believe. There's a definition part of the statute that explains what it means. Well, they kind of refer to each other, so it might take that they mean the same thing. The allegation of indictment in the statute requires illegally using, which can be done through misappropriation by breach of fiduciary duty, which is what happened here. And that was sufficiently alleged in the indictment, and that's the elements of that case. And I guess misappropriation does not include intent to permanently deprive, ostensibly anyway. It does not have to. Essentially, if there were a case in which somebody withdrew a million dollars and took it to Las Vegas, or took it and tried to invest in penny stocks, or do something to grow that money. Essentially, the defendant's argument here is, well, I put it to try to hold on to it and grow it, maybe. Well, as long as that's being done for his own use, not for the benefit of his mother, essentially, the trial court does not have to believe his story that he was holding it for his mother's use. When it goes into account in his own name, when it could have gone into account, that his mother held. So if he takes it, makes money on it, and then returns the principal and keeps the profit, that's still a crime? Right, you're right. Well, if it violates the other elements of the statute, yes, Your Honor. I mean, essentially, the fact that he took that money for his own account when she had a joint bank account that could have... Well, what I described pretty well describes... What I said as an example pretty well describes what he was charged with, correct? Right, Your Honor. As far as I can tell. He was charged with misappropriating it. And there's no reason, legitimate reason, and he doesn't have to... Well, he was charged with illegally using it, which includes misappropriation, which apparently does not include the intent to permanently deprive. Did I say that right? Yes, Your Honor, because even if he spent, like, $500 on medicine a month later after withdrawing it, it doesn't absolve him for what he did initially. He didn't have to take it out of the account. The trial court doesn't have to believe his explanations for why he moved it out of the account. Once it goes from that joint account into his own account, the state's theory of the law is that that constitutes a misappropriation, and that would be a crime because he meets the other elements of this offense. What if he put it into his account in order to protect her assets from creditors? That was his sole purpose for doing so. And if... Is that still a misappropriation? If they had agreed that that was something that they should do, and that was not going to harm his mother, then... Well, they didn't agree to it under my hypothetical. Right. She got to the point where she didn't really understand what was going on. So he takes it out of her account, puts it into his, protects her from creditors. Is that a misappropriation? It can be because that's essentially almost like this case here, which is her creditor is her nursing home, and it's in her best interest to be able to stay there. And to stay there, her bills have to be paid. So essentially, even if he admitted his intent was to try to protect her money, which maybe he was going to inherit in the future when she dies, from her creditors, i.e. the nursing home. But it's getting awful close to perhaps civil liability. Civil liability, but does it go over the border to criminal liability? I guess your answer is yes. Yes. Civil liability can become criminal liability when the legislature says so. And the legislature said so here. So that's the state's position. And I have no further argument, and I would entertain any other questions. All right, I think that's it. Thanks, Ms. Brooks. Okay, thank you. Any questions for Mr. Shiffman? Ms. Brooks has described the trial unlike the trial that occurred in this case. For the first time now in this court, we're told that the crime occurred when Mr. Ford moved the money from an account where he was a co-owner to an account where he was the sole owner. If, in fact, that is true, then why did we have to hear all of these other testimonies and all of this other information about what occurred with the money afterwards? It's not the moving of the money. It's what occurred afterwards. And the suggestion that the legislature can criminalize civil wrongs may have some significance, but the legislature cannot and cannot criminalize that which has been recognized by the law for hundreds of years as civil actions. I don't believe that when the legislature enacted the financial exploitation statute, that it was their intent to undo centuries of probate law, centuries of guardianship law, centuries of financial relationships that people often undertake because through mental difficulty or other physical problems, they cannot exercise their own control over their assets. Let's assume just for a moment for the purposes of this argument that Mrs. Ford did not have any children, that Mrs. Ford had contacted a broker at Merrill Lynch to be her guardian. And she had entrusted him with a certain amount of money. And on the first day of that entrustment, he had taken $15,000 of her money and invested it in Apple stock, thinking that Apple would be a wonderful investment and would make money for Mrs. Ford. Three days later, four days later, Apple makes an announcement that sales of their newest computer are off and the Apple stock that was invested, $15,000 of Apple stock is now worth $5,000. Is Merrill Lynch subject to criminal prosecution by the state of Illinois under this statute? I don't believe so. I don't believe that was what the legislature intended. In reality, we must always keep in mind that words of the law often have dual meanings. And innocent is one of those words. Innocent conduct often has nothing to do with criminal penalties and the criminal law. A person can make an innocent remark to another person who might be insulted but doesn't have the right to then sue for criminal defamation. Legal words often have double meanings, sometimes even triple meanings. And the legislature, I do not believe, intended to undo what it has done for years with respect to civil and state laws in connection with a case like this. We believe that Mr. Ford was punished for innocent conduct. We believe that the statute violates due process for that reason. We believe he should have received some further information from the state with respect to exactly what he was alleged to have done. And we believe that the jury should have been properly instructed in this case. And we're asking that his conviction be reversed. Thank you, Mr. Schiffman. The court will take this matter under advisement and stand in recess.